## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KAABAR VENSON,
        Plaintiff

    v.

TERRELL PORK, *et al.*
        Defendants

No. 21 CV 5108

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiff Kabaar Venson filed this four-count lawsuit against Defendants Terrell Pork and William Brown under 42 U.S.C. § 1983. The claims arise from an alleged incident of physical, verbal, and sexual abuse perpetuated by the defendants against Venson while she was incarcerated at Stateville Correctional Facility ("Stateville"). The defendants deny that the assault happened. Before the Court is the defendants' motion for summary judgment as to all counts (R. 70.)[1] For the reasons set forth below, the Court grants the defendants' motion as to Count II and denies it as to all other counts. On or before October 21, 2024, the parties shall submit a joint status report that addresses the anticipated length of trial and the parties' availability for trial in April, May, and June of 2025.[2]

---

[1] For ECF Filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

[2] The Court previously took the plaintiff's motion to file a surreply (R. 84) under advisement (R. 86.) The decision to allow a party to file a surreply is in the Court's discretion. *See Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014 (citing *Johnny Blastoff, Inc. v. L.A. Rams*, 188 F.3d 427, 439 (7th Cir. 1999)). A denial is appropriate when the movant "has had the opportunity to thoroughly brief the issues." *Id.* Having reviewed the parties' submissions, the Court finds that the surreply raises

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[3] the materials cited therein, and other aspects of the record in this case. "The facts are hotly disputed but" the Court "must credit [Venson's] version and draw all reasonable inferences in her favor because [s]he is the party opposing summary judgment." *Tolliver v. City of Chi.*, 820 F.3d 237, 239 (7th Cir. 2016).

Venson is an inmate who, at all times relevant to this lawsuit, was incarcerated at Stateville. (Pl. Resp. to Def. SOF ¶ 6.) Sergeant Pork and Lieutenant Brown worked at Stateville as correctional officers. (*Id.* ¶¶ 2–3.) Venson identifies as a transgender woman. (*Id.* ¶ 7.) While at Stateville, she was housed in the segregation wing, called X-House, where both defendants were assigned. (Def. Resp. to Pl. SOF ¶¶ 1–2.) According to Venson, while incarcerated in X-House, she endured physical and verbal abuse and harassment from other incarcerated individuals, corrections officers, and the defendants. (*Id.* ¶ 3.) Venson filed numerous grievances and Prison Rape Elimination Act ("PREA") complaints. (*Id.* ¶ 4.)

The specific events underlying this lawsuit occurred on March 23, 2018. There is not much the parties agree on as to what happened that day. The Court will

---

no new arguments, and the plaintiff has had an opportunity to thoroughly brief the issues. The motion is denied.

[3] *See* Defendants' Rule 56.1 Statement of Material Facts (R. 71) ("Def. SOF"); Plaintiff's Response in Opposition to Defendants' Rule 56.1 Statement of Material Facts (R. 79) ("Pl. Resp. to Def. SOF"); Plaintiff's Rule 56.1(b)(3) Additional Statements of Material Facts (R. 78) ("Pl. SOF"); Defendants' Response to Plaintiff's Statement of Additional Material Facts (R. 82) ("Def. Resp. to Pl. SOF"). Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3).

describe each parties' understanding of what happened, but notes again that as the non-movant, Venson's account must be credited. *Tolliver*, 820 F.3d at 239.

## I. VENSON'S DESCRIPTION OF EVENTS

On March 23, 2018, Venson was scheduled to meet with Internal Affairs to discuss a PREA complaint she had filed previously. (Def. SOF ¶ 8; Pl. SOF ¶ 5.) The complaint did not implicate either of the defendants, but rather one of their colleagues. (Pl. SOF ¶ 5.) Another correctional officer, Officer Michael Bubash, went to Venson's cell to inform her of the meeting. (Def. Resp. to Pl. SOF ¶ 6.) Stateville policy requires that all X-House inmates submit to a strip search before leaving their cells. (*Id.* ¶ 7.) Venson was strip searched before departing her cell. (*Id.* ¶ 8.) During transport, Venson was restrained "in handcuffs that were secured to [her] waist chain and leg restraints[.]" (*Id.* ¶ 9.) Venson arrived at her meeting without incident.

Venson had a brief meeting with Internal Affairs. (Pl. SOF ¶ 11.) She stopped the meeting because she believed that the officer conducting the meeting "was not taking her PREA complaint allegations seriously." (*Id.*) Still restrained, Venson was escorted from the meeting by Bubash and Pork. (*Id.* ¶ 12.) During transport, Brown approached the group and said "Fuck this shit. I'm tired of this." (*Id.* ¶ 13.) He then pushed Bubash out of the way and grabbed Venson's arm. (*Id.*) Venson alleges that the defendants "forcibly drag[g]ed her to the X-House bullpen. (*Id.* ¶ 14.) X-House's bullpen does not have cameras. (*Id.*)

Once in the bullpen, Venson was tripped, then slammed face-first into the bullpen floor. (Pl. SOF ¶ 15.) Venson describes a brutal physical, verbal, and sexual

assault, which resulted in her urinating on herself. (*See id.* ¶¶ 15–19.) The defendants left Venson lying on the bullpen floor. (*Id.* ¶ 19.) While lying there, Pork returned to the bullpen to tell Venson to "shut up" and "not say shit" about the assault (*Id.* ¶ 20.) Pork then told Venson she would need to submit to a strip search, even though she had been searched prior to the Internal Affairs meeting. (*Id.* ¶ 21.) Venson said she would consent to the strip search but that she needed medical attention. (R. 78-1 ("Venson Dep.") at 90:14–21.) The prison's tactical team was deployed to perform the strip search; this was captured by body camera footage from the tactical team. (*Id.* ¶¶ 22–23; R. 71-11.) Venson testified that she experienced significant pain and could only stand up with support from the tactical team. (Pl. SOF ¶ 24; Pl. Resp. to Def. SOF ¶ 15.) Nothing was recovered from the search. (Def. Resp. to Pl. SOF ¶ 25.)

Afterward, a medical technician, Bobby Nagpal, examined Venson. (*Id.* ¶ 26; Pl. Resp. to Def. SOF ¶ 16.) According to Venson, the examination lasted less than thirty seconds, and she screamed out in pain when Nagpal pressed on her back. (Def. Resp. to Pl. SOF ¶ 26.) Venson was taken back to her cell by the tactical team; she was pushed in face-first. (Pl. SOF ¶ 28.) Venson was examined by a doctor on March 25, 2018, after threating to harm herself. (*Id.* ¶ 29; *cf.* R. 71-10 (listing examination date as March 24, 2018).)

## II.    THE DEFENDANTS' DESCRIPTION OF EVENTS

The defendants agree that Venson had a scheduled meeting with Internal Affairs on March 23, 2018. (Def. Resp. to Pl. SOF ¶ 6.) However, according to the defendants, prior to the meeting, Venson broke off a five-inch piece of plastic from a

lunch tray from a meal she had in her cell. (Def. SOF ¶ 9; *see also* R. 78–3 ("Bubash Dep.") at 55:21–56:12 (describing procedure for passing out meals to segregated inmates).) Venson then made threatening statements about using the piece of plastic against Stateville corrections officers. (*Id.* ¶ 9.) The defendants admit that Venson was strip searched before she left her cell for the Internal Affairs meeting. (Def. Resp. to Pl. SOF ¶ 8.)

While Venson was at her meeting, Bubash searched Venson's cell for the plastic, but did not find it. (Def. SOF ¶ 10.) After the meeting, Venson was transported to the X-House bullpen for the purpose of performing a strip search for the plastic. (*Id.* ¶ 11.) The defendants deny that any sort of physical, verbal, or sexual assault occurred. (Def. Resp. to Pl. SOF ¶¶ 13–18.) According to the defendants, Venson refused to comply with the order to strip several times. (Def. SOF ¶ 13.) The tactical team was called to perform the search. (*Id.* ¶ 14–15.) They arrived on the scene and found Venson lying face-up on the ground with no one else in the room. (*Id.* ¶ 15.) After completion of the strip search, Nagpal examined Venson and found no injuries. (*Id.* ¶ 16.) Venson was dressed and taken back to her cell. (*Id.* ¶ 17.) The next day, Venson was examined by medical professionals and no injuries were found. (*Id.* ¶ 18.)

## III. PROCEDURAL POSTURE

Venson filed a grievance regarding the assault. The Administrative Review Board ultimately denied the claims against the prison officials in the grievance. (Pl. Resp. to Def. SOF ¶ 22.) This lawsuit followed. The governing First Amended Complaint was filed on March 1, 2022 (R. 16 ("FAC").)

5

## LEGAL STANDARD

"Summary judgment is proper against a party who, after sufficient time for discovery, fails to show how a factfinder could find in his favor on an essential element on which the party would bear the burden of proof at trial." *Kemp v. Fulton Cnty.*, 27 F.4th 491, 494 (7th Cir. 2022). In other words, if the record "shows that there is no genuine issue as to any material fact [ ] the moving party is entitled to summary judgment as a matter of law." *Woods*, 234 F.3d at 986 (quoting *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 391–92 (7th Cir. 1990)) (internal quotations omitted). But "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," summary judgment is not appropriate. *Orozco v. Dart*, 64 F.4th 806, 814 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 248 (1986)). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder . . . the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (internal quotations and alterations omitted). The Court construes "the record in the light most favorable to the nonmovant[.]" *Id.* Above all, "summary judgment cannot be used to resolve swearing contests between the litigants." *Id.* (collecting cases).

## ANALYSIS[4]

### I.   COUNT I – EXCESSIVE FORCE

Turning to the underlying allegations, the defendants move for summary judgment on Venson's excessive force claim. They argue that there is "no factual basis on the record to substantiate [Venson's] claims that [the d]efendants used excessive force against her in violation of her Constitutional rights." (R. 72 at 5.) Venson, however, identifies factual disputes that preclude summary judgment.

The Eighth Amendment's protection against cruel and unusual punishment prohibits the 'unnecessary and wanton infliction of pain' on prisoners." *Jones v. Anderson*, _F.4th_, No. 21 2929, 2024 WL 3976051, at *5 (7th Cir. Aug. 29, 2024) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). Punishment that is "so totally without penological justification that it results in the gratuitous infliction of suffering" will "always violate [ ] contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003).

When a prisoner alleges that excessive force was used by a guard in a manner that violates the Eighth Amendment, the Court will ask whether "the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

---

[4] In her opposition to the defendants' motion for summary judgment, Venson argues that the defendants' motion "erroneously rel[ies] on inadmissible and unauthenticated evidence." (R. 77 at 5.) She asks the Court to strike several exhibits and factual statements from the defendants' Statement of Facts for failure to authenticate and/or reliance on inadmissible hearsay. (*Id.* at 5–6). The Court considered these arguments and determined that the asserted facts were not pertinent to the Court's decision here. Therefore, there is no need to address the evidentiary arguments to resolve this motion.

sadistically to cause harm." *Aaron v. Surguy*, No. 23 1394, 2023 WL 6563385, at *2 (7th Cir. Oct. 10, 2023) (internal quotations omitted) (unpub.). In addition to physical injury, the "infliction of psychological pain is also prohibited." *Calhoun*, 319 F.3d at 939. And the "'[u]nwanted touching of a [prisoner]'s private parts' with the intent to 'humiliate the victim or gratify the assailant's sexual desires may establish a constitutional violation, even if the force used is not significant." *See Adams v. Falkner*, No. 18 C 8223, 2021 WL 2681891, at *2 (N.D. Ill. June 30, 2021) (quoting *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012)).

Here, it is disputed whether the defendants assaulted Venson. Venson alleges a vicious physical, verbal, and sexual assault by the defendants in the X-House bullpen. (Pl. SOF ¶¶ 13–18.) But Brown testified that the assault did not occur (*see* R. 71-2 ("Brown Dep.") at 172:19–173:11), and the defendants argue that Venson was moved to the X-House bullpen solely to be strip searched for the plastic. (R. 72 at 5.) Venson contends that the defendants' explanation is pretextual because no plastic was ever found, and she was strip searched before her meeting with Internal Affairs, around when the purported plastic was broken. (R. 77 at 9.) This amounts to a swearing contest that the Court cannot resolve. *Payne*, 337 F.3d at 770. Whether Venson was assaulted is a factual question; taking the facts in the light most favorable to her, the jury could find that the defendants assaulted Venson.

Contrary to the defendants' argument, there is evidence in the record that the assault happened because Venson testified extensively that it did. (*See, e.g.*, Venson Dep. at 46:8–48:7.) The Seventh Circuit has repeatedly explained that deposition

8

testimony, affidavits, responses to interrogatories, and other written statements are "by their nature self-serving," and has overruled its cases that "suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute." *Hill v. Tangherlini*, 724 F.3d 965, 967, n. 1 (7th Cir. 2013). Venson's reliance on her testimony is an appropriate means of showing there is a material factual dispute.

Nor does the video evidence submitted by the defendants "blatantly contradict[ ]" the plaintiff's account, as they suggest. (R. 72 at 2, 4–5); *Scott v. Harris*, 550 U.S. 372, 380 (2007). Video evidence can "eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). It is a "'narrow, pragmatic exception' . . . but only where the video 'utterly discredit[s]' the non-movant's version of the facts." *Id.* (quoting *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019)). That is not the case here. The defendants acknowledge that there are no video cameras in the X-House bullpen. (R. 72 at 5.) The only available video footage comes from body camera footage from the tactical team. (R. 71-11.) It is plausible that this footage was created *after* the alleged assault occurred, a possibility bolstered by Venson yelling in the video about the assault in the past tense. (*Id.*) And there are disputes about what the video shows. (*Compare* R. 72 at 7 *with*, R. 77 at 6, 10.) It therefore cannot be said that one of those stories is "blatantly contradicted by the record so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380.

Finally, the defendants argue that the documentary evidence "show[s] that [Venson] suffered no physical mistreatment or injury from [the defendants]." (R. 72

at 5.) In other words, "the medical examination subsequent to the alleged assault, done by several medical professionals, showed no signs of injury." (R. 81 at 2.) But Venson testified about her injuries. (*See, e.g.*, Venson Dep. at 131:12 –139:6.) This is another factual dispute that the Court cannot appropriately resolve at this stage. Therefore, the defendants have not shown they are entitled to summary judgment as a matter of law on their excessive force claim. The motion as to Count I is denied.

## II.     COUNT II – FAILURE TO PROTECT

The Court next considers the merits of Venson's failure to protect claim. "A prison official is liable for failing to protect an inmate . . . only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). There are two requirements for a failure to protect claim. First, the "harm to which the prisoner was exposed must be an objectively serious one"; this is known as the objective component of the claim. *Id.* Then, the Court will turn to what is known as the subjective component, which "requires that the official [ ] have actual, and not merely constructive, knowledge of the risk in order to be held liable." *Id.* Specifically, the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (quoting *Farmer*, 511 U.S. at 837) (internal quotations omitted). It is a high standard: "the prisoner must establish that the official was actually informed of a specific, credible, and imminent risk of serious harm." *See Jackson v. Baldwin*, 2021 WL 3142172, at *5 (N.D. Ill. July 26, 2021). A prisoner normally demonstrates this "actual

10

knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480 (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (per curiam)).

The defendants are entitled to summary judgment on Count II. As discussed, there is a genuine dispute as to whether the defendants assaulted Venson. There is no question that the beating Venson alleges is an "objectively serious one." *See Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020) (describing a "violent beating" as the "kind of in prison assault that is simply not part of the penalty that criminal offenders pay for their offenses against society." (internal citations and quotations omitted)).

But Venson cannot demonstrate that the defendants had knowledge of a risk. This is best illustrated by *Williams v. Cook County*, which was decided by another court in this district. No. 20 C 1537. 2023 WL 8371979 (N.D. Ill. Dec. 4, 2023). There, the plaintiff alleged that he was sexually assaulted by a corrections officer while incarcerated. *Id.* at *3. The plaintiff also alleged after this first assault, a second corrections officer assaulted him as well, in retaliation for reporting the first officer. *Id.* at *5. The plaintiff's lawsuit claimed that both officers "failed to protect [the plaintiff] from the sexual assaults at the hands of the other officers." *Id.* at *1.

The court dismissed the failure to protect claim against the second corrections officer, finding that it was "incompatible" with the plaintiff's excessive force theory. *Id.* at *10. The court explained:

> "At the heart of a failure to protect claim is the question, failure to protect *from what*? Here, [the plaintiff] answers that [the defendant]

11

> himself was both the danger and his guardian. This simply cannot be right. The elements of a failure to protect claim presuppose a 'risk' of which a reasonable officer would be aware and seek to abate for the inmate's safety."

*Id.* (emphasis in original). The court articulated several examples of the type of risk contemplated by a failure to protect claim, reasoning that this shows a requirement for "external sources of risk" and not "harm from the correctional officer whom a plaintiff accuses of posing the risk from which other officers must protect." *Id.* (emphasis in original). In other words, there must be "a substantial risk *beforehand* that serious harm might actually occur." *Santiago v. Walls*, 599 F.3d 749, 758 (7th Cir. 2010) (citing *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005)) (emphasis added); *see also Gevas*, 798 F.3d at 480–81 (collecting cases describing how prison officials must know about specific threats to safety in advance of violence).

Here, Venson's failure to protect claim paints the defendants as both dangers and guardians. (*See* R. 77 at 11 ("[E]ach defendant acted with 'deliberate indifference' by failing to intervene and stop the abuse."); FAC ¶¶ 51–53). This cannot be. In addition, given the contemporaneous nature of the alleged assault on Venson, neither officer could have possessed the requisite knowledge of the risk of harm the other posed; like the officers in *Williams*, they themselves were the risk of harm. Finally, as in *Williams*, the excessive force and failure to protect claims are "completely intertwined." *Williams*, 2023 WL 8371979, at *10, n. 5. If a jury determined that the assault perpetuated on Venson by the defendants did not occur, there would be no risk against which either officer could have protected Venson, and vice versa. It

therefore "does [Venson] no good" to bring a failure to protect claim. *See id.* The facts as alleged, and the evidence in the record, do not support a failure to protect claim.

It is possible that Venson meant to style her failure to protect claim as a failure to intervene claim; there are numerous places in the record where the parties use "intervene" or "intervention," suggesting a comingling. (*See* FAC ¶ 53 ("Further, both Brown and Pork failed to intervene while the other dragged Venson…"); R. 72 at 6 (Plaintiff alleges in Count II of her First Amended Complaint that Defendants failed to intervene to protect her…"); R. 77 at 12 ("…by failing to intervene and stop the abuse.").) Even if Count II was construed as a failure to intervene claim, as opposed to failure to protect, the outcome would be the same. A failure to intervene claim is "a theory of liability that allows a plaintiff to prove the liability of *an official who did not directly participate* in the challenged wrong." *See Jackson v. Vasquez*, No. 20 C 6004, 2023 WL 319530, at *3 (N.D. Ill. Jan. 18, 2023) (emphasis added); *see also Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (recognizing the failure to intervene theory as one where an officer had a "realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail[ed] to do so." (internal citations and quotations omitted)). Both defendants are alleged to have participated in the constitutional wrong; a failure to intervene claim would not be successful. Count II must be dismissed.

### III.    COUNT III – RETALIATION

The defendants also move for summary judgment on Venson's First Amendment retaliation claim. The defendants argue that there is nothing in the

record to support the claim that the defendants' retaliated against her for filing grievances (R. 72 at 8.) Venson, among other things, focuses on the conduct allegedly displayed by Brown after her Internal Affairs meeting as the basis for showing that the two are connected. (R. 77 at 14.)

There are three elements to a First Amendment retaliation claim: (1) the plaintiff must have "engaged in activity protected by the First Amendment"; (2) the plaintiff "suffered a deprivation that would likely deter First Amendment activity in the future," and (3) "the First Amendment was 'at least a motivating factor' in [the defendants'] decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). The defendants do not dispute that Venson engaged in an activity protected by the First Amendment. (R. 72 at 9); *see also, e.g., Daughtery v. Page*, 906 F.3d 606, 610 (7th Cir. 2010) ("Under the first element, the filing of a prison grievance is a constitutionally protected activity supporting a First Amendment retaliation claim[.]"). Rather, they argue that there is no evidence from which a jury could find for Venson on the second and third elements.

Whether the deprivation suffered by the plaintiff would likely deter First Amendment activity in the future is an objective question; in other words, the inquiry is whether "the retaliatory activities would deter a person of ordinary firmness from exercising First Amendment activity in the future." *Bridges*, 557 F.3d at 552 (internal quotations omitted). The defendants argue that Venson cannot show that the alleged deprivation would deter future First Amendment conduct because "[Venson] filed

14

frequent grievances and PREA complaints against several corrections officers, even after the alleged incident occurred." (R. 72 at 10.) But the alleged deprivation need not deter the plaintiff herself. *See Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103, 1110 (N.D. Ill. 2019). A "specific plaintiff's persistence does not undermine his claim." *See Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (rejecting defendant's argument that because the plaintiff "continued to file additional grievances" no First Amendment activity was deterred). The fact that Venson continued to file grievances after the alleged assault is therefore irrelevant to this part of the analysis.

Some examples of alleged retaliatory conduct that have been found to be "more than enough to deter a person of ordinary firmness from exercising his rights under the First Amendment" includes unjustified searches, discipline, solitary confinement, and interference with phone and mail. *See Dobbey*, 417 F. Supp. 3d at 1110. And since there is no justification for harassing people for exercising their constitutional rights, the effect of the conduct on Venson's speech need not be great to be actionable. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Construing Venson's recitation of the facts in the light most favorable to her, the alleged assault would deter a person of ordinary firmness from exercising her rights under the First Amendment. *See McKinley v. Schoenbeck*, 731 Fed. Appx. 511, 515 (7th Cir. 2018) ("A beating would also deter an ordinary person from exercising his or her First Amendment rights.").

A claim of retaliation also requires that the conduct was at least a "motivating factor" in the defendants' decision to retaliate. It is the plaintiff's burden to make that showing; only then will the "burden shift to the defendant to show that he or she

15

would have taken that action anyway." *See Gevas v. Dunlop*, No. 18 C 6556, 2021 WL 4061749, at *10 (N.D. Ill. Sep. 8, 2021) (citing *Hasan v. U.S. Dep't of Lab.*, 400 F.3d 1001, 1005 (7th Cir. 2005)). The plaintiff must show a "causal link between the activity and the unlawful retention." *Id.* (quoting *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020)). In other words, Venson must show that the defendants' actions—the alleged assault—were the result of her filing grievances and PREA complaints.

As previously discussed, Venson's deposition testimony can be used to show a genuine dispute of material fact. Venson testified that as she was transported from her meeting to discuss her PREA complaint with Internal Affairs, Brown approached her and said "Fuck this shit. I'm tired of this"; Brown, with the assistance of Pork, then proceeded to drag Venson to the X-House bullpen, where the assault occurred. (Pl. SOF ¶¶ 12–13; Venson Dep. at 46:14–47:6; 61:7–62:3.) A causal link can be established through either direct or circumstantial evidence, such as "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other[s]." *Manuel*, 966 F.3d at 680 (quoting *Long v. Teachers' Ret. Sys. Of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)) (alteration in original). And while suspicious timing on its own, or the mere speculation of retaliation, is "insufficient to create a triable issue of fact," *see Dunlop*, 2021 WL 4061749, at *10, the facts here, taken in the light most favorable to Venson, demonstrate that there is more here than solely suspicious timing or speculation.

The defendants admit that they knew that Venson had a history of filing grievances and PREA complaints, a protected activity. (R. 82 ¶ 38.) Venson testified

that she was leaving a meeting to discuss that protected activity when Brown approached, setting forward the chain of events leading to the alleged assault. (Pl. SOF ¶¶ 11–13; Venson Dep. at 46:14–47:6.) A jury could find that Brown's comments, and the assault that followed, were connected to Venson's practice of filing grievances and PREA complaints. Therefore, the defendants' motion for summary judgment as to Count III is denied.

### IV.    COUNT IV – EQUAL PROTECTION CLAUSE

Finally, the defendants move for summary judgment as to Venson's claim that the defendants violated the equal protection clause. Because the same factual disputes the Court has already discussed with respect to excessive force underlie this count, the defendants are not entitled to summary judgment.

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.'" *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017), *abrogation recognized on other grounds by, Kluge v. Brownsburg Comm. Sch. Corp.*, 64 F.4th 861 (7th Cir. 2023) (quoting *City of Cleburn v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Prisoners, like Venson, "do not surrender their rights to equal protection at the prison gate." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988).

In an equal protection analysis, the Court considers "whether the claim involves a suspect class or a fundamental right." *Pryor v. Brennan*, 914 F.2d 921, 923 (7th Cir. 1990). The Seventh Circuit has not determined whether transgender

individuals constitute a suspect class. *See Whitaker*, 858 F.3d at 1051 (declining to reach the question of whether "transgender status is per se entitled to heightened scrutiny" because the record showed "sex stereotyping" such that applying heightened scrutiny was appropriate). However, Venson alleges she was assaulted by the defendants because she is a transgender woman. (*See, e.g.*, R. 77 at 15; Venson Dep. at 145:24–146:18; FAC ¶¶ 68–73.) Because the defendants' conduct is allegedly based upon sex, heightened scrutiny applies. *See Whitaker*, 858 F.3d at 1051 ("The rational basis test, however, does not apply when a classification is based on sex.").

"When a sex-based classification is used," the discriminating party must show that its "proffered justification is 'exceedingly persuasive.'" *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). The party must show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objections." *Id.* (internal quotations and citations omitted). However, at this stage, the Court need not analyze whether the defendants' conduct was "substantially related" to "important governmental objectives" because, as with Count I, there is an important threshold question that must be determined first: did the attack on Venson occur as alleged? As previously explained, the Court cannot decide that question at this stage.

The existence of this factual dispute precludes summary judgment, regardless of Venson's classification. "[T]here is virtually no scenarios imaginable where sexual harassment . . . is substantially related to important government objectives," *Hess v. Garcia*, 72 F.4th 753, 761 (7th Cir. 2023) (quoting *Bohen v. East Chi.*, 799 F.2d 1180,

1187 (7th Cir. 1986) (internal quotations omitted), and therefore "there is no legitimate governmental purpose for such actions." *Id.* The Court denies the motion with respect to Count IV.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [70] is granted as to Count II, and denied as to Counts I, III, and IV. On or before October 21, 2024, the parties shall submit a joint status report that includes a list of the remaining claims, the anticipated length of trial, and any trial conflicts in April, May, and June of 2025.

Date: October 4, 2024

_____
JEREMY C. DANIEL
United States District Judge